DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| GUAM INDUSTRIAL SERVICES, INC., dba GUAM SHIPYARD; and MATTHEWS POTHEN, <br><br>         Plaintiffs, <br>    v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, a corporation; and STARR INDEMNITY & LIABILITY COMPANY, a corporation, <br>         Defendants. | CIVIL CASE NO. 11-00014 <br><br> DECISION AND ORDER: <br> (1) GRANTING ZURICH & STARR'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT II (ECF NO. 89); <br> (2) DENYING GUAM SHIPYARD & POTHEN'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT II (ECF NO. 131); <br> (3) GRANTING ZURICH'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I (ECF NO. 169); AND <br> (4) DENYING GUAM SHIPYARD'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNT I (ECF NO. 176) |
| ZURICH AMERICAN INSURANCE COMPANY, a corporation; and STARR INDEMNITY & LIABILITY COMPANY, a corporation, <br>         Plaintiffs, <br>    v. <br><br> GUAM INDUSTRIAL SERVICES, INC., dba GUAM SHIPYARD; MATTHEWS POTHEN; and THE UNITED STATES OF AMERICA, by and through the Secretary of Transportation for the Maritime Administration, <br>         Defendants. | *as consolidated with* <br><br> CIVIL CASE NO. 11-00031 |

This is an insurance coverage dispute arising from the sinking of a drydock. Under the Fourth Amended Complaint, the insured seeks to recover for the insurers' alleged improper denial of coverage. Four motions and cross-motions have been filed seeking summary judgment on this complaint. (ECF Nos. 89, 131, 169, 176.) The Court concludes that there is no coverage here under the insurance policy. Accordingly, the motions seeking summary judgment denying coverage (ECF Nos. 89, 169) are GRANTED, and the motions seeking recognition of coverage (ECF Nos. 131, 176) are DENIED.

## I.    BACKGROUND

Plaintiff Guam Industrial Services (hereinafter "Guam Shipyard") owns a drydock named the Machinist. (ECF No. 118 at 2 (hereinafter "Count II Plaintiffs' Opposition"); ECF No. 200 at ¶ 5 (hereinafter "Fourth Amended Complaint").) Plaintiff Matthews Pothen is Guam Shipyard's Chief Executive Officer. (Fourth Amended Complaint at ¶ 6.) In January 2011, the Machinist sank. (ECF No. 89-1 at 1 (hereinafter "Count II Defendants' Motion"); ECF No. 133-10 at 6; *see* Count II Plaintiffs' Opposition at 10.) No oil or other pollution escaped from the Machinist. (ECF No. 172-1 at 60–62.)

The United States Coast Guard ordered that "no salvage and repair operations would be permitted until after all threats of any pollutant discharge were properly mitigated." (ECF No. 171 at 5; *see also* ECF No. 182 at 6 (hereinafter "Count I Guam Shipyard's Reply")).) Guam Shipyard undertook these efforts of removing oil from the Machinist. (ECF No. 171 at 5; *see also* Count I Guam Shipyard's Reply at 6–7.)

Guam Shipyard and Pothen have now filed a two-count complaint.[1] In Count I, Guam Shipyard alone seeks to recover the salvage expenses incurred under its insurance policy with Defendant Zurich American Insurance Company (hereinafter "Zurich"). (*See* Fourth Amended Complaint at ¶¶ 9–21.)

Under Count II, both Guam Shipyard and Pothen seek to recover for the damages to the Machinist under their insurance policy with both Zurich and Defendant Starr Indemnity & Liability Company (hereinafter "Starr"). (*See id.* at ¶¶ 22–30.) Under this policy, Plaintiffs "warranted" that the Machinist "is U.S. Navy Certified and Certification maintained." (ECF No. 90-1 at 20; *see also id.* at 3.) The Machinist was not U.S. Navy certified at the time of the accident. Nor was it ever. (Count II Plaintiffs' Opposition at 4.)

Despite not having Navy certification, the Machinist typically had a commercial certification from Heger Dry Dock, Inc. (hereinafter "Heger"). (ECF No. 133-10 at 8.) This class of certification has less demanding standards than the Navy's. (ECF No. 90-1 at 37.)

Though usually commercially certified, the Machinist lacked any certification at the time of its sinking. (ECF No. 133-10 at 8; ECF No. 119 at 3.) Its last commercial certification expired in October 2010, and Heger refused to recertify the Machinist due to its having "severe corrosion" (ECF No. 90-1 at 39; ECF No. 90-5 at 35).

Whether Defendants knew that the Machinist was never Navy certified is unclear, but some evidence—for instance, an email to Defendants' underwriters providing "the renewal information" and attaching the commercial certification (ECF No. 133-5 at 2–3; Count II Plaintiffs' Opposition at 10)—demonstrates that they may have known.

---

[1] Guam Shipyard and Pothen have filed one complaint and three amended complaints in this matter. (*See* ECF Nos. 68, 74, 105, 200.) The summary judgment motions precede the Fourth Amended Complaint and are directed to the Second and Third Amended Complaints. (*See, e.g.*, Count II Defendants' Motion at 1 n.1.) For the purpose of these motions, the Fourth Amended Complaint is substantively identical and does not change the analysis. No party argued otherwise at the motions' hearing.

## II.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1333 (maritime).

## III.    STANDARD

On a Rule 56 motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "[t]he court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549–50 (9th Cir. 1994). Additionally, it must view the evidence "in the light most favorable to the opposing party." *Mourning v. Family Pubs. Serv., Inc.*, 411 U.S. 356, 382 (1973) (internal quotation marks omitted).

The moving party bears the initial burden of identifying "particular parts of materials in the record" that "demonstrate the absence of a genuine issue of material fact." Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the moving party also bears the burden of persuasion at trial, . . . it must show that 'the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008). If the moving party meets this burden, the non-moving party must then do similarly, except to demonstrate that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## IV.    DISCUSSION

This dispute raises primarily three questions: what law applies; is the damage to the Machinist covered under the insurance policy; and are Guam Shipyard's measures taken to

prevent the escape of pollution covered under the insurance policy? The court addresses each question in turn.

### A. CHOICE OF LAW

Marine insurance "occupie[s] a unique place" in federal admiralty law. *Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.*, 518 F.3d 645, 649 (9th Cir. 2008); *see also Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955). In interpreting a marine insurance contract, the "threshold matter [is] whether federal admiralty law contains an established, applicable rule." *Certain Underwriters at Lloyds, London*, 518 F.3d at 649–50; *Yu v. Albany Ins. Co.*, 281 F.3d 803, 806 (9th Cir. 2002). Federal admiralty law includes federal statute and "judicially fashioned admiralty rule[s]." *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 510 (9th Cir. 1984). If there is a relevant federal law, that is the rule to be applied. *See Certain Underwriters at Lloyds, London*, 518 F.3d at 649–50; *Yu*, 281 F.3d at 806. If there is not, "state law controls," *Certain Underwriters at Lloyds, London*, 518 F.3d at 649–50, unless there is "a need for uniformity in admiralty practice," *id.* at 650; *Yu*, 281 F.3d at 806.

### B. COUNT II

Count II of the complaint asserts that Zurich and Starr insured the Machinist and that this policy covered the damage to the Machinist incurred from its sinking. (*See* Fourth Amended Complaint at ¶ 22–30.) Zurich and Starr seek summary judgment on this claim, on the ground that Guam Shipyard and Pothen breached the policy's express warranty of U.S. Navy certification and that breach voids coverage. (Count II Defendants' Motion at 1–2.) The Court first analyzes the warranty in question, next breach and effect thereof, and then potential excuses for breach.

### 1. Warranty

The operative insurance policy agreement between Plaintiffs and Defendants contained a warranty and exclusions section. The single warranty provided that the "insured drydock is U.S. Navy Certified and Certification maintained." (ECF No. 90-1 at 20; *see also id.* at 3 (explaining that the subject matter of this insurance policy is the "Floating Dry Dock 'Machinist'").)

### 2. Breach and Effect

Plaintiffs and Defendants disagree on the law for determining breach of a warranty in a marine insurance policy. Initially, Defendants Zurich and Starr contend that, under federal admiralty law, a warranty is breached when not strictly complied with. (Count II Defendants' Motion at 8.) Plaintiffs Guam Shipyard and Pothen disagree, contending there is no such federal admiralty law applicable here. (Count II Plaintiffs' Opposition at 18–19.) Nor is there any Guam law on point. (*Id.* at 19–20.) Defendants then respond that even if Guam law controls, Guam courts would probably require strict compliance, if given the opportunity to rule on the issue. (Count II Defendants' Reply at 9.)

As a matter of federal admiralty law, the Supreme Court has suggested that strict performance of warranties in marine insurance contracts is not "part of the body of federal admiralty law in this country[,]" and therefore, "the consequences of breaching [policy provisions] can only be determined by state law . . . ." *Wilburn Boat Co.*, 348 U.S. at 315–16, 321 (footnote omitted); Patrick J.S. Griggs, *Coverage, Warranties, Concealment, Disclosure, Exclusions, Misrepresentations, and Bad Faith*, 66 Tul. L. Rev. 423, 435 (1991) (stating that the *Wilburn Boat* Court "noted that no federal rules dealt with the consequences of a breach of warranty in marine policies"). Notwithstanding this, courts have interpreted *Wilburn Boat* along three lines: state law on marine insurance contracts controls; federal law requiring strict

compliance controls; and the most common approach: both federal and state law require strict compliance, so it matters not which controls. 2 Thomas J. Schoenbaum & Jessica L. McClellan, Admiralty & Mar. Law § 19-15 (5th ed.).

Illustrating this diverging authority, various Courts of Appeals have determined that federal admiralty law requires strict compliance for certain warranties. *See, e.g.*, *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1367 (11th Cir. 1988) ("[A]dmiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss."). The Ninth Circuit has also suggested that federal law requires strict compliance, but it did not decide the issue because it found state law required strict compliance as well. *See Yu*, 281 F.3d at 808–09. Thus, *if* there is an applicable federal admiralty law, it would require strict compliance with the warranty.

Guam law is silent on the issue. (Count II Plaintiffs' Opposition at 19–20; Count II Defendants' Reply at 9.) Where the requirements of state law are unclear, "a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 812 (9th Cir. 2002) (internal quotation marks omitted). This determination is guided by "decisions from other jurisdictions, statutes, treatises, and restatements . . . ." *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).

California law may be illuminating, as "Guam's insurance statutes were adopted from California," *Fajardo ex rel. Fajardo v. Liberty House Guam*, 2000 Guam 4, ¶ 15. For unknown reasons, the Guam legislature omitted in entirety California's provisions on warranties. *Compare* 18 GC §§ 18101–18802 (not including provisions on warranties) *with* Cal. Ins. Code. §§ 440–49 (provisions on warranties). It seems unlikely that the legislature's omission intended to convey

7

disapproval of all California law on insurance warranties. And given the historical nexus between Guam and California insurance law, Guam courts likely would continue to consult California law for guidance. Under that state's law, violations of material warranties render the policy voidable by the non-breaching party, *id.* § 447, whereas violations of immaterial warranties do not, *id.* § 448.

Guam courts would likely find this certification warranty material because most states find maritime insurance warranties need be strictly complied with. *See, e.g.*, *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 31 (2d Cir. 1999) ("Under the federal rule and the law of most states, warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover."); *see also Yu*, 281 F.3d at 809. Under what commentators describe as the American rule, the effect of a warranty's breach "is that the coverage is either suspended or is voidable [(by the insurer, such as when it moves to void the coverage in a court proceeding)]." 2 Schoenbaum & McClellan, Admiralty & Mar. Law § 19-15 (5th ed.).

Not only is this rule common, it is also sensible. Requiring strict compliance with a warranty, irrespective of whether the breach caused the loss, "recogni[zes] that it is peculiarly difficult for marine insurers to assess their risk, such that insurers must rely on the . . . warranties made by insureds . . . ." *Yu*, 281 F.3d at 809. This is especially so where the warranty "directly 'affect[s] the risk . . . undertaken.'" *Id.* at 810.

Such is the case here. The certification warranty directly affects the risk undertaken because certification is a proxy of a vessel's condition: A certified vessel is likely in better condition and is, therefore, less likely to suffer accidents. This lower risk of accident is somewhat evidenced in Navy Instructions, which have required that U.S. Navy ships use only certified drydocks due to safety concerns. *See* Naval Seas Systems Command, NAVSEA

Instruction 11420.1B 2–3 (1988), *available at* http://www.navsea.navy.mil/NAVINST/11420-001B.pdf (prior Navy Instruction on certification criteria for drydocks); *see also* Department of Defense, Standard Practice: Safety Certification Program for Drydocking Facilities and Shipbuilding Ways for U.S. Navy Ships 1 (2009) (stating that the purpose of the certification program "is to ensure the safety of U.S. Navy ships during docking and undocking operations"), *available at* http://quicksearch.dla.mil/docimages/A/0000/0003/7023/000004595936_000000214774_CTUD RJNQSM.PDF.

For these reasons, it is likely that the Guam Supreme Court would require strict compliance. Thus, when a warranty is not strictly complied with, the insurer may properly deny coverage, irrespective of whether the breach is causally related to the loss.

Applying this law here, Guam Shipyard and Pothen breached the insurance policy. They warranted that the Machinist had and would continue to have U.S. Navy certification. It did not. (Count II Plaintiffs' Opposition at 4.) Though at times the Machinist had commercial certification, it lacked any certification at the time of its sinking. (ECF No. 133-10 at 8; ECF No. 119 at 3.) By failing to strictly comply with the warranty's requirements, Plaintiffs breached the insurance policy, and Defendants Zurich and Starr may rightfully deny coverage.

### 3.   Excuses for Non-Performance

Plaintiffs raise three excuses for their non-performance: construing ambiguity in their favor, waiver, and estoppel. None demonstrate a genuine issue of material fact capable of excusing their breach.

### a.   Construing Ambiguity

Plaintiffs and Defendants disagree over which party should have ambiguous provisions

9

construed against it. (Count II Defendants' Motion at 10–11; Count II Plaintiffs' Opposition at 15–18; Count II Defendants' Reply at 7–8.) The Court concludes that the answer is neither party. Only when an insurance policy is ambiguous is it to be construed in a manner favoring one party over the other. *Yasuda Fire & Marine Ins. Co. v. Heights Enters.*, 1998 Guam 5, ¶ 12. If unambiguous, the "language governs." *Id.* Because the warranty of Navy certification is "not capable of two or more reasonable interpretations," cf. *id.* at ¶ 14; see also Count II Plaintiffs' Opposition at 15 (agreeing that "there is no ambiguity in the warranty"), the language governs, and it is not construed in favor of or against either party.

### b. Waiver

Plaintiffs Guam Shipyard and Pothen contend that Defendants Zurich and Starr waived their right to strict compliance with the certification warranty. (Count II Plaintiffs' Opposition at 7–13.) Under Guam law, "[w]aiver is the intentional relinquishment of a known right." *Guam Hous. and Urban Renewal Auth. v. Dongbu Ins. Co., Ltd.*, 2001 Guam 24, ¶ 16. Generally, "questions of intent[] may not always be amenable to disposition on summary judgment." *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983). But "where there is actually little disagreement over the facts; what is disputed is the legal effect of those facts. . . . [S]uch a dispute . . . can quite properly be decided on summary judgment." *Id.*

Here, the facts are not disputed; the parties dispute only their legal effect. Properly framed, the waiver issue is two-fold. First, did Defendants waive the requirement of Navy certification? If yes, was this waiver complete or partial—that is, did they waive their right to insist on *any* certification (even commercial), or only their right to insist on Navy certification?

Plaintiffs' reading is that Defendants' conduct creates a genuine factual issue as to whether Defendants waived their right to insist on Navy certification. (Count II Plaintiffs' Opposition at 12.) They then argue that this waiver must be complete because once Defendants

waived their express right to Navy certification, they waived their right to any certification. (*Id.*) Thus, in their view, the only possible warranty for commercial certification would be an implied warranty. (*Id.* at 12–13.) As an implied warranty, breach would require additional proof of causation, which has not been shown. (*Id.* at 13.)

As to Plaintiffs' first argument, they are probably right: There is a genuine issue of material fact as to whether Defendants waived their right to Navy certification. Some evidence indicates that Zurich and Starr may have known the Machinist was commercially certified (ECF No. 133-5 at 2–3), yet they proceeded to insure it anyway. This may be sufficient.

But even if this conduct amounts to waiver, it does not waive Zurich and Starr's right to any certification. When an insurer waives its right to insist on strict compliance, it still remains entitled to insist on substantial compliance. *Guam Hous. and Urban Renewal Auth.*, 2001 Guam 24 at ¶¶ 16, 20. It follows, then, that an insurer may waive its right to a more demanding standard (say, certification by the U.S. Navy) in favor of one less demanding (commercial certification).

The evidence presented, when viewed in the light most favorable to Plaintiffs, shows that Defendants knew the Machinist possessed commercial, not Navy certification, and they nevertheless insured it. This may be the intentional relinquishment of Zurich and Starr's right to insist on the more burdensome Navy certification, but it does not demonstrate a genuine issue as to whether they waived their right to instead insist on commercial certification.

They did not waive that right. To conclude otherwise, there must at least be some evidence indicating they would have issued the insurance policy on the same terms without the commercial certification. Plaintiffs do not point to any such evidence; they point only to evidence that Defendants "were fully aware that the only certification on the dry dock was the Heger commercial certification." (Count II Plaintiffs' Opposition at 9.)

If the Court were to follow Plaintiffs' argument to its logical conclusion, it would lead to absurd results. Take a rental agreement with a monthly rent of $1,000. The lessor may repeatedly and consistently require that the lessee pay only $800. Under Plaintiffs' argument, the lessor has now waived her right to insist on any rent whatsoever.

Plaintiffs also advance a second argument as to partial waiver. When Defendants issued the policy in September 2010, they knew that the certification expired in October 2010. (*Id.* at 12.) Therefore, Plaintiffs continue, Zurich and Starr waived their right to a certification because they knew the policy was expiring and did not, after the certification's lapse, "follow up" with Plaintiffs about certification. (*Id.*)

Nowhere in this argument do Plaintiffs cite to evidence indicating that Defendants knew the certification was not renewed. Furthermore, Defendants had no contractual obligation to follow up, as Plaintiffs warranted that they would keep the "[c]ertification maintained" (ECF No. 90-1 at 20). In prior years, Plaintiffs did keep this certification maintained (*see* ECF No. 133-6 at 7 (commercial certification for August 2008 to July 2010); ECF No. 133-5 at 3 (same, but for July 2010 to October 2010)), and nothing in the record indicates Defendants knew the commercial certification would be lost. Without such evidence, they cannot have intentionally relinquished their rights.

In sum, there may be a genuine factual issue as to whether Zurich and Starr waived their right to insist on Navy certification. But even if they did, there is no genuine issue as to whether they waived their right to insist on commercial certification: They did not.

### c.  Estoppel

Plaintiffs contend that equitable estoppel bars Zurich and Starr from insisting on compliance with the warranty provision. (Count II Plaintiffs' Opposition at 13–15.)

Proving equitable estoppel requires satisfying four elements:

(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon; (3) the party asserting the estoppel must be ignorant of the true state of the facts; and (4) he must rely upon the conduct to his injury.

*Mobil Oil Guam, Inc. v. Young Ha Lee*, 2004 Guam 9, ¶ 24.

Equitable estoppel does not apply here. Fundamentally, the relevant "conduct" is that Defendants allegedly did not insist on Navy certification and instead proceeded only with Heger's commercial certification. This conduct is confirmed by the only evidence Plaintiffs cite in its argument, Pothen's declaration. (*See* ECF No. 119 at 3 (stating that Guam Shipyard, in seeking insurance, always provided "copies of Heger's commercial certification" and that Defendants "Zurich and Starr accepted [this]").)

This conduct does not satisfy estoppels' requirements. Under the second requirement, Plaintiffs could not reasonably believe that Defendants' conduct of accepting commercial certification indicated that Defendants actually required no certification. Nor is the first element satisfied, as Plaintiffs do not highlight any evidence indicating Defendants knew that the Machinist lacked any certification.

### 4. Conclusion

For these reasons, summary judgment on Count II is entered in favor Zurich and Starr. This moots Guam Shipyard and Pothen's corresponding motion for summary judgment on this count (ECF No. 131). That motion raises three grounds for why Zurich and Starr cannot deny coverage, one of which includes the argument that the Navy Certification warranty was not

breached. (*Id.* at 6.) Their arguments on the certification issue remain virtually the same as those advanced in their opposition to Defendants' motion. (*Compare id.* at 10–14 *with* Count II Plaintiffs' Opposition at 7–14.) Because the Court concludes that the Navy certification warranty was breached, Zurich and Starr may properly deny coverage, and Plaintiffs' motion is moot.

## C. COUNT I

Count I of the complaint regards a separate insurance policy contract between Guam Shipyard and Zurich. (ECF No. 176 at 1 (hereinafter "Count I Guam Shipyard's Opposition"); Fourth Amended Complaint at ¶ 9.) This is a liability insurance policy that includes coverage for pollution. (Count I Guam Shipyard's Opposition at 1; *See* Fourth Amended Complaint at ¶ 9.) Zurich seeks summary judgment on this claim on the ground that policy's coverage was not triggered because there was no damage to another's property and no actual pollution. (ECF No. 170 at 1 (hereinafter "Count I Zurich's Motion").)

The Court first addresses whether the policy provides coverage. Next it addresses the alternative question of whether public policy requires finding coverage. Finally, it addresses three brief arguments raised in the motions.

### 1. Policy Coverage

Insurance coverage disputes are generally analyzed under a two part framework. First, a court must determine whether the event is within the insurance policy's basic coverage, with the burden of proof resting on the insured. *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1557 (9th Cir 1991) (citing *Royal Globe Ins. Co. v. Whitaker*, 181 Cal. App. 3d 532 (1986)). If the event is covered, the burden then shifts to "the insurer to prove a claim covered falls within an exclusion." *Id.*; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Guam Hous. and Urban Renewal Auth.*, 2003 Guam 19, ¶ 23.

14

In interpreting these provisions, Zurich and Guam Shipyard agree that Guam's statutory construction principles control. (*See* Count I Guam Shipyard's Reply at 9; Count I Zurich's Motion at 9.) In an unambiguous insurance policy, "the clear and explicit language governs." *Yasuda Fire & Marine Ins. Co. v. Heights Enters.*, 1998 Guam 5 at ¶ 13. To demonstrate that a policy is actually ambiguous, "it must be shown that a provision is capable of two or more reasonable interpretations." *Id.* at ¶ 14. A reasonable interpretation is not one that is "strained or absurd . . . ." *Id.*

### a. Affirmative Coverage

Guam Shipyard contends that the insurance policy provides coverage in two different sections: Section 1 and Endorsement 10.

Under Section 1, the policy provides coverage for events where "the insured . . . become[s] legally obligated to pay and . . . ha[s] paid as damages because of . . . property damage . . . to which this insurance applies . . . ." (ECF No. 172-1 at 9.)

Assuming this section's requirements are satisfied, Exclusion K clarifies that the policy does not cover "property damage to . . . property owned or occupied by . . . the insured . . . ." (*Id.* at 10.) Here, Zurich has met its burden in demonstrating that the only property damage was to Guam Shipyard's property. It has presented evidence in the form of Guam Shipyard's admissions, based on the information available eighteen months after the incident, that it was "unaware of any petroleum products[,] . . . . smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants or pollutants being released into the waters . . . ."[2] (*Id.* at 60–62.)

---

[2] Initially, Guam Shipyard's opposition may have implied that use of this evidence on summary judgment was improper. (*See* Count I Guam Shipyard's Opposition at 7–8.) After Zurich's Response (ECF No. 179 at 3–5

Guam Shipyard does not rebut these arguments. It cites cases holding that "oil pollution to water is construed to be damage to 'tangible property'" (Count I Guam Shipyard's Opposition at 4 (citing *Port of Portland v. Water Quality Ind. Syndicate*, 796 F.2d 1188, 1194 (9th Cir. 1986)), but it cites no evidence indicating that any such pollution occurred here. It even admits that the "oil and other pollutants did not leak from their containers . . . ." (Count I Guam Shipyard's Reply at 7.)

Instead, Guam Shipyard argues that the sinking of the Machinist (and the oil contained within it) is damage to another's property even when the oil never escapes into the water. (*See* Count I Guam Shipyard's Reply at 6; *see also* Count I Guam Shipyard's Opposition at 6.) Thus, the removal of oil from the sunken Machinist should be "treated in the same manner as removal of pollution from an oil spill." (Count I Guam Shipyard's Reply at 7.)

This argument is problematic and the analogy faulty. In an oil spill, pollution actually escapes from the vessel and into a body of water, and it is this "oil pollution to water [that] is injury to tangible property." *Port of Portland*, 796 F.2d at 1194. Here, no pollution escaped from the Machinist, so it is not apparent whose property—besides Guam Shipyard's—was damaged. And though true that the Machinist's sinking made the potential future release of oil greater, if not inevitable, no such release had yet occurred.

In short, Guam law requires that the unambiguous language of an insurance policy govern. Section 1 and Exclusion K operate to permit coverage only for damages to another's property. Because there was no such damage here, these provisions do not provide coverage.

The second potential source for coverage is Endorsement 10, the Time Element Pollution Endorsement (hereinafter "Endorsement"). An endorsement is part of the insurance policy itself.

---

(hereinafter Count I Zurich's Reply)), Guam Shipyard clarified that it did not object to using these admissions to establish the factual conclusion that no pollution escaped from their containers (Count I Guam Shipyard's Reply at 7–8).

2 Lee F. Russ & Thomas F. Segalla, Couch On Ins. § 21:21 (3d ed.).

The Endorsement provides coverage for claims "arising out of the discharge, dispersal, release, or escape of . . . oil or other petroleum substances . . . into . . . any body of water" where six requirements are satisfied. (*See* ECF No. 172-1 at 33; *see also* Count I Guam Shipyard's Opposition at 10.) Guam Shipyard and Zurich contest the meaning of discharge or release of oil into a body of water. Guam Shipyard argues it includes both actual and potential discharges (Count I Guam Shipyard's Opposition at 6, 11); Zurich argues it includes only actual ones (Count I Zurich's Motion at 9–10; *see also* Count I Zurich's Reply at 6).

The Endorsement includes only actual, not potential, discharges of oil. The words discharge, dispersal, release, and escape all necessarily imply that the oil actually discharged or escaped. The phrase "oil escaped from the vessel and into the sea" naturally reads as the oil actually left the hull. The alternative reading essentially advanced by Guam Shipyard—the oil potentially will leave or has already left the hull—is strained.

To capture events involving potential discharges, some modifying language is required, indicating that the policy covers not only actual releases, but potential ones as well. Elsewhere the insurance policy provides this clarification. (*See* ECF No. 172-1 at 3 (Pollution Exclusion Clause stating that the policy does not cover the "actual or potential discharge" of oil).) Because it did not do so here, the Endorsement does not cover potential discharges.

Seeking to avoid this conclusion, Guam Shipyard argues that the discharge or escape of oil should be defined as the "movement of the substances from a state of confinement and control to one that is not confined or controlled." (Count I Guam Shipyard's Opposition at 6.) Guam Shipyard derives this definition entirely from  the First Circuit case *St. Paul Fire and Marine Insurance Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195 (1st Cir. 1994). (*See* Count I Guam Shipyard's Opposition at 6.)

This proffered definition is untenable. First, the First Circuit apparently rejected the definition. *See St. Paul Fire and Marine Ins. Co.*, 26 F.3d at 1204 (rejecting insured's argument that "the relevant discharge for purposes of the pollution exclusion was the escape of hazardous substances from a state of containment at the L & RR landfill into or upon the land outside the confines of the landfill"). Furthermore, that court's analysis focused on the actual release of pollution: The waste "was removed from its containers on [the insured's] premises and placed into the landfill—literally onto the land—where it later caused contamination." *See id.* at 1205.

In sum, the policy provides coverage only where there is either damage to another's property or the actual discharge of oil, which effectively results in damage to another's property. Here, only Guam Shipyard's property was damaged, and no oil was actually discharged. Lacking these predicates, the insurance policy does not provide coverage.

### b. Exclusion

Even if Section 1 or the Endorsement provides coverage, that coverage may be excluded under an exclusion clause. Zurich argues that the Pollution Exclusion Clause does just this. (Count I Zurich's Motion at 9.)

This clause excludes, basically, any liability for pollution—whether potential future or actual pollution—from coverage under the insurance policy. Abridged, this policy reads:

> Notwithstanding anything to the contrary this Policy does not insure against any
> loss, damage, cost, liability, expense, [or] fine . . . incurred by or imposed on the
> insured . . . with respect to[] the actual or potential discharge, emission, spillage
> or leakage upon or into the seas . . . of oil, petroleum products, chemicals . . . .

(ECF No. 172-1 at 3.) A non-abridged version appears in the footnote below.[3]

---

[3] "Notwithstanding anything to the contrary this Policy does not insure against any loss, damage, cost, liability,

18

This exclusion clause's text would preclude coverage. It excludes coverage for the cost imposed on Guam Shipyard by the Coast Guard in addressing the potential discharge of oil from the Machinist.

Guam Shipyard advances three arguments contrary to this conclusion. Strongest is the argument that the relationship between the Pollution Exclusion Clause and the Endorsement is ambiguous. (*See* Count I Guam Shipyard's Opposition at 9–11.) That is, the Endorsement provides coverage for the damages associated with the actual discharge of oil, but the exclusion removes coverage for the damages associated with both the actual and potential damages.

With this conflict creating ambiguity, Guam law requires that courts construe the policy in the manner consistent with "the objectively reasonable expectations of the insured." *Yasuda Fire & Marine Ins. Co., Ltd.*, 2005 Guam at ¶ 13 (internal quotation marks omitted). Here, that interpretation would result in the policy providing coverage where the Endorsement applies, notwithstanding the exclusion, and not providing coverage where the Endorsement does not apply. Guam Shipyard cannot reasonably expect the Endorsement to provide coverage where it does not, textually, provide any coverage. *See supra* at 17–18. Thus, because the Endorsement does not apply—there was no discharge or release of pollutants—the exclusion clause remains operative and expressly excludes the costs associated with the potential discharge of oil. Zurich agrees with this conclusion. (Count I Zurich's Motion at 11.)

Guam Shipyard's remaining two arguments are less persuasive. It argues that its actions were mandated by federal agencies and, therefore, were not preventative measures. (Count I Guam Shipyard's Opposition at 8–9.) Mandated or not, what matters is that the Pollution

---

expense, fine or penalty of any kind or nature whatsoever, and whether statutory or otherwise, incurred by or imposed on the insured, directly or indirectly, in consequence of, or with respect to, the actual or potential discharge, emission, spillage or leakage upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever." (ECF No. 172-1 at 3.)

Exclusion Clause bars coverage of the costs associated with the potential discharge of oil. Even if the mandatory nature was relevant, the clause itself contemplates excluding coverage for costs mandated by the government. *See* (ECF No. 172-1 at 3 (excluding "cost[s], liabilit[ies], . . . [and] *fine[s]* . . . incurred by or *imposed on* the insured. (emphasis added)).)

Guam Shipyard also cites three isolated cases in contending that exclusion clauses should be limited in application to active polluters, such as those operating a waste facility, and should not be applied to passive polluters like itself. (Count I Guam Shipyard's Opposition at 11–12.) Whatever these case's holdings, other courts instead focus on the exclusion's plain meaning in holding that it applies to both passive and active polluters. *New Castle Cnty. v. Hartford Acc. and Indem. Co.*, 970 F.2d 1267, 1272–73 (3d Cir. 1992); *Park-Ohio Indus., Inc. v. Home Indem. Co.*, 975 F.2d 1215, 1222 (6th Cir. 1992); *N. Ins. Co. of New York v. Aardvark Assocs., Inc.*, 942 F.2d 189, 194 (3d Cir. 1991). Because Guam law focuses on the exclusion's text and applying the result it unambiguously compels, Guam courts would likely be reluctant to read-in a requirement that the exclusion applies only to active polluters.

For these reasons, the Court concludes that even if Section 1 or the Endorsement applied here, the Pollution Exclusion Clause would bar coverage.

### 2. Public Policy

Guam Shipyard argues that public policy requires providing coverage. (Count I Guam Shipyard's Opposition at 13–14.) This argument is premised on a Guam statute governing first party insurance. First party insurance protects against losses sustained directly by the insured, such as fire insurance for one's own home. David B. Goodwin, Book Review, *Disputing Insurance Coverage Disputes*, 43 Stan. L. Rev. 779, 780 n.6 (1991). By contrast, third party insurance protects against losses sustained through liability to another. *Id.* The policy here is not

first party insurance because it protects against only property damage sustained by another, and therefore, it is instead third party insurance.

The Guam statute on first party insurance provides that the insurer is liable where "a loss is caused by efforts to rescue the thing insured from a peril insured against." 22 GCA § 18601(b). Guam courts apparently have not interpreted this statute. Guam Shipyard states that this statute is based on California Insurance Code § 531 (Count I Guam Shipyard's Opposition at 13), which is materially identical to Guam's statute. Where a Guam statute is adopted from California, "California case law on this issue is persuasive when there is no compelling reason to deviate from California's interpretation." *O'Mara v. Hechanova*, 2001 Guam 13, ¶ 8 n.1.

Guam Shipyard directs the Court to two California cases, both of which cite this California provision in the context of third party insurance. (Count I Guam Shipyard's Opposition at 13–14.) Both courts held that mitigation costs were recoverable on public policy grounds, even though it was not explicitly covered in the insurance policy. *See State of California v. Allstate Ins. Co.*, 201 P.3d 1147, 1160 (Cal. 2009); *Globe Indem. Co. v. State of California*, 43 Cal. App. 3d 745, 749–53 (Cal. Ct. App. 1974).

But it appears important to these court's reasoning that the policy's coverage was actually triggered. The *Globe Indemnity* court highlighted the irrationality of the insured being covered "against the liability of paying for the damages to tangible property resulting from a fire which, because of his negligence, spread to the property of another and not to have been insured against the liability imposed . . . for the suppression costs incurred in fighting the fire." *Globe Indem. Co.*, 43 Cal. App. 3d at 753. Similarly, the *Allstate Insurance* court noted that the "threat of property damage (arising by hypothesis from a covered cause) leads naturally to [mitigating] acts . . . ." *Allstate Ins. Co.*, 201 P.3d at 1160.

This reasoning does not easily translate here. In both cases, coverage was triggered by the damaging of others' property. *See id.* at 1153; *Globe Indem. Co.*, 43 Cal. App. 3d at 748. Here, the pollution was not discharged and, therefore, policy coverage was not triggered.

Arguably, permitting the insured to recover mitigation costs before coverage is triggered would unfairly transform the insurance coverage. For instance, say the insured bought liability insurance providing coverage for when he negligently starts a fire that damages another's property, but not his own. If courts permitted the recovery of mitigation costs when the fire both ignited and extinguished without ever leaving the insured's property, it effectively allows the insured to prevent further damage to his own property at cost to the insurer. This transforms the insurance policy because the insured did not purchase insurance covering his own property.

Language in the California cases suggest this transformation would be improper. They reasoned partly on the grounds of the insured's reasonable expectations: In purchasing liability insurance for damage to another's property, one reasonably expects that costs spent mitigating those covered damages are included as well. *Allstate Ins. Co.*, 201 P.3d at 1160; *Globe Indem. Co.*, 43 Cal. App. 3d at 751–53. By contrast, the insured probably cannot reasonably expect that liability insurance includes the cost of mitigating uncovered damages that may, in the future, lead to covered damages.

For these reasons, California courts probably would not permit the recovery of mitigation costs here. Thus, even if Guam courts followed California courts, they would not permit recovery.

### 3. Miscellaneous Arguments

Three other arguments are briefly advanced in the motions that do not meaningfully change this Court's analysis.

First, Zurich argues that the insurance policy's lack of a "sue and labor" clause means that Guam Shipyard's mitigating expenses are not covered. (Count I Zurich's Motion at 10–11.) Guam Shipyard contends this is irrelevant and that what matters is only whether there is coverage under the policy itself. (Count I Guam Shipyard's Opposition at 18.)

This Court has already determined that the policy does not provide coverage. The lack of a sue and labor clause further buttresses this conclusion. A sue and labor clause operates to grant affirmative coverage for the insured's expenses incurred in protecting the insured property. 12 Lee R. Russ & Thomas F. Segalla, Couch on Ins. § 183:163 (3d ed.) ("[T]he insurer's duty under a 'sue and labor' clause [is] to compensate the insured for expenses incurred in preservation and protection of the insured property . . . ."); *see also Home Ins. Co. v. Ciconett*, 179 F.2d 892, 895 (6th Cir. 1950) ("Its purpose is to encourage and bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss. Under this clause the assured recovers the whole of the sue and labor expense which he has incurred . . . ."). The insurance policy here, lacking this clause, reaffirms that Zurich did not assume the obligation to pay these expenses.

Second, Zurich argues that it did not assume an implied obligation to cover Zurich's preventative measures. (Count I Zurich's Motion at 12–14.) Guam Shipyard agrees that there is no implied obligation, thus narrowing its argument to only express obligations within the policy. (Count I Guam Shipyard's Opposition at 16.) Nonetheless, it challenges Zurich's reading of its cited cases. (*See id.* at 16–18.) Because Guam Shipyard does not argue there was an implied obligation, it therefore concedes there was none. So whatever these cases say is irrelevant.

Third, Guam Shipyard argues that it should receive attorneys' fees because it should have been reimbursed under the policy. (*Id.* at 15.) Because the Court concludes that its acts were not

covered by the policy, it is not entitled to reimbursement and, therefore, not entitled to attorneys' fees.

## V.    CONCLUSION

Zurich and Starr's motion for summary judgment on Count II is granted, and Guam Shipyard and Pothen's corresponding motion is denied. Summary judgment on Count II is granted in favor of Zurich and Starr, and that count is dismissed with prejudice.

Zurich's motion for judgment on Count I is granted, and Guam Shipyard's corresponding motion is denied. Summary judgment on Count I is granted in favor of Zurich, and that count is dismissed with prejudice.

This results in the dismissal, in entirety, of Guam Shipyard and Pothen's complaint. Zurich and Starr, however, have filed their own complaint for declaratory relief. (ECF No. 199.) That complaint's basic aim is a declaration that there is no insurance coverage here (*id.* at ¶ 14), which the Court effectively provides in this decision. However, the Court notes that this complaint also seeks costs and other appropriate relief (*id.*) and that this decision does not rule on those claims.

SO ORDERED this 13th day of September, 2013.



**/s/ Frances M. Tydingco-Gatewood**
     **Chief Judge**